**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| MANHATTAN ASSOCIATES, INC., | ) | 2:04-CV-01174-BES-RJJ |
| Plaintiff, | ) | |
| | ) | **ORDER** |
| v. | ) | |
| | ) | |
| PAN WESTERN CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

    Before the Court is Motion for Summary Judgment (#18) filed by Plaintiff Manhattan Associates, Inc. ("Manhattan"). Defendant, Pan Western Corporation ("Pan Western"), filed a Response to the Motion for Summary Judgment (#21). Thereafter, Manhattan filed its Reply in Support of Motion for Summary Judgment (#25).

**I. BACKGROUND**

    Plaintiff is a Georgia corporation engaged in the business of licensing supply chain software applications to clients in various markets, including consumer goods, food, government, high tech, industrial and third-party logistics. (Pl.'s Mot. (#18), p. 2). Pan Western is a Nevada transportation company that provides transportation and warehousing services in forty-eight states. Id. Pan Western is regarded as a third-party logistics business, and provides services such as storage, bailment, transportation and shipping for third parties. Id.

    In 2003, Pan Western began looking for software to manage its third-party warehousing business. (Def.'s Opp. (#21), p. 1). On November 24, 2003 Pan Western's President, Mitchell

Truman ("Truman"), contacted Manhattan. (Pl.'s Mot. (#18), p. 3). Pan Western was seeking a "plug and play" system that would not require extensive costs for installation or implementation but would meet Pan Western's warehousing requirements. (Id. at 2). Pan Western claims that Truman personally informed Manhattan's Bobby Collins ("Collins") that Pan Western needed a third-party warehouse program "that could receive orders, receive electronic transfers, run product history, inventory, shipping history, set up orders and move product from inventory to staging and from staging to inventory, and be able to print bills of lading and shipping manifests." (Statement of Undisputed Facts in Support of Def's Opp. (#22), p. 1–2). According to Pan Western, Manhattan made oral representations that each of these features were included in Manhattan's basic third-party warehouse software program. (Def.'s Opp. (#21), p. 2). Shortly thereafter, Pan Western representatives and Manhattan representatives participated in a webcast in which Manhattan demonstrated its software application via the Internet through screen shots while the group conferred by speaker phone. (Pl.'s Mot. (#18), p. 3). Pan Western claims that all the features it sought were shown during the webcast as part of Manhattan's basic third-party warehouse software program. (Def.'s Opp. (#21), p. 2).

Manhattan submitted a written software license and services proposal to Pan Western on December 10, 2003. (Pl.'s Mot. (#18), p. 4). Manhattan claims the proposal included a budgetary estimation of between $60,000 and $200,000 for implementation of the software at Pan Western's offices. (Id.). According to Pan Western, however, Truman never saw this implementation estimation or discussed implementation pricing with Manhattan. (Def.'s Opp. (#21), p. 6). The parties continued to negotiate after the initial proposal and reached an agreement in late December of 2003. (Id. at 5). Before the agreement was executed, Pan Western's outside counsel, Keith Gregory, reviewed the proposed agreement and advised Truman about its terms. (Id.). On December 31, 2003, the parties entered into a signed contract. (Id.).

Pursuant to the contractual agreement, Manhattan agreed to grant Pan Western a license to use its Warehouse Management for Windows program and its Billing Management

program. (Pl.'s Mot. (#18), Ex. E at 12–18). Manhattan further agreed to provide customer support and software enhancements to Pan Western. (Id. at 19). In consideration, Pan Western agreed to pay the following: (1) software license fees in the amount of $45,000 (plus taxes in the amount of $3,375), (2) software maintenance and support fees in the amount of $9,000, (3) software escrow fees in the amount of $350, (4) fees for implementation services, (5) prejudgment interest in the amount of 1.5 % a month, and (6) reasonable attorney's fees and litigation expenses. (Id. at 14–18). The contract included no cap on the total amount of implementation services that might be incurred. (Pl.'s Mot. (#18), p. 6). An Addendum to the Agreement contains an integration clause that supersedes all prior or concurrent proposals and understandings, oral or written between the parties. (Id. at 6–7).

In January of 2004, Manhattan's representative traveled to Pan Western's office to observe the operations of the warehouse and to assist in the implementation of the software. (Def.'s Opp. (#21), p. 3). The representative remained for two weeks and was unable to make the software program operate, or to produce any documentation that Pan Western required. (Id.). At the end of the two-week period, Manhattan's representative informed Pan Western that it would cost at least an additional $20,000.00 to alter the program to print bills of lading, shipping manifests, and other documents required by Pan Western. (Id.). At this point, Pan Western claims it became aware that it had been mislead by Manhattan, and Pan Western therefore informed Manhattan it would not expend additional funds for features that were stated to be included in the basic software program. (Id. at 4). It is undisputed that Pan Western's Truman then terminated the implementation. (Pl.'s Mot. (#18), p. 7). It is also undisputed that Manhattan's software remains fully loaded on Pan Western's computers and Pan Western has not paid the contract price. (Id. at 9).

Manhattan filed its complaint on August 23, 2004. In Count 1, Manhattan alleges that Pan Western materially breached the contract by its failure to pay the license fees, customer support and software enhancement fees, implementation costs, and interest totaling $97,078.37. (Complaint, (#1), at ¶ 21). In Count 2, Manhattan seeks attorney's fees and expenses of litigation according to Article V.5(E) of the parties' contract. (Id. at ¶ 25–26).

Finally, in Count 3, Manhattan seeks prejudgment interest pursuant to Article V.5(E) of the parties' contract. (Id. at ¶ 29).

Pan Western asserts the affirmative defenses of misrepresentation and fraud in the inducement. (Def.'s Opp. (#21), p. 4). Pan Western argues that it informed Manhattan of its specific requirements that the software produce bills of lading, shipping manifests, histories of shipping, and inventories without high implementation costs. (Id. at 5). Pan Western claims Manhattan affirmatively stated that these features would be included in the basic software program. (Id. at 4). Pan Western argues there is a genuine issue of fact as to Manhattan's representation, and whether Pan Western was induced by fraud to execute the contract.

## II. ANALYSIS

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. Lynn v. Sheet Metal Workers Int'l Ass'n, 804 F.2d 1472, 1483 (9th Cir. 1986). The burden of demonstrating the absence of a genuine issue of material fact lies with the moving party, and for this purpose, the material lodged by the moving party must be viewed in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Martinez v. City of Los Angeles, 141 F.3d 1373, 1378 (9th Cir. 1998).

Any dispute regarding a material issue of fact must be genuine—the evidence must be such that "a reasonable jury could return a verdict for the nonmoving party." Id. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial" and summary judgment is proper. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "A mere scintilla of evidence will not do, for a jury is permitted to draw only those inferences of which the evidence is reasonably susceptible; it may not resort to speculation." British Airways Board v. Boeing Co., 585 F.2d 946, 952 (9th Cir. 1978). The evidence must be significantly

probative, and cannot be merely colorable. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). Conclusory allegations that are unsupported by factual data cannot defeat a motion for summary judgment. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

**A.     Breach of Contract**

To establish a cause of action for breach of contract in Nevada, a plaintiff must prove: (1) that there was a valid contract; (2) that the plaintiff performed as specified by the contract; (3) that the defendant failed to perform as specified by the contract; and (4) that the plaintiff suffered an economic loss as a result of the defendant's breach of contract. See Rubacky v. Restifo, __ F.Supp.3d __, No. 05-CV-00465-RCJ-(LRL), 2006 WL 2039974, at *3 (D. Nev. July 20, 2006) (citing Stewart v. Life Ins. Co. Of North America, 388 F.Supp.2d 1138 (E.D.Cal. 2005)).

Considerable factual disputes exist in this case that must be resolved before the breach of contract claim can be addressed. Specifically, the parties dispute whether the contract they entered into is valid and binding. Pan Western argues it was led to execute the contract based upon Manhattan's representation that the basic version of the software would produce bills of lading, shipping manifests, histories of shipping and inventories, and other documentation. (Def.'s Opp. (#21), p. 4). Manhattan argues that Pan Western cannot establish the prima facie elements of fraud in the inducement because it has failed to prove any intent to defraud and knowledge of the falsity of the representations. (Pl.'s Rep. (#25), p. 3).

**B.     Fraud in the Inducement**

To establish fraud in the inducement under Nevada law, Pan Western must prove by clear and convincing evidence each of the following elements: (1) a false representation was made by Manhattan; (2) Manhattan knew or believed that the representation was false (or knew there was an insufficient basis for making the representation); (3) Manhattan intended to induce Pan Western to consent to the contract's formation; (4) Pan Western justifiably relied upon the misrepresentation; and (5) damage resulted to Pan Western from such reliance. J.A. Jones Const. v. Lehrer McGovern Bobis, Inc., 89 P.3d 1009, 1018 (Nev. 2004). The parol evidence rule does not apply where, as here, a party seeks rescission of the contract on the

grounds that it was fraudulently induced.  Stearns' Properties v. Trans-World Holding Corp., 492 F.Supp 238, 242 (D. Nev. 1980) (citing Friendly Irishman, Inc. v. Ronnow, 74 Nev. 316, 330 P.2d 497 (1958) (parol evidence admissible to demonstrate fraud in the procurement of a written contract)).

The evidence is sufficient to establish a genuine issue of material fact as to whether Manhattan made a false representation.  Pan Western presents evidence that Manhattan made a false representation when it indicated that the basic warehouse program could produce bills of lading, shipping manifests, histories of shipping and inventory among other items.  (Def.'s Opp. (#21), p. 5).  Manhattan further indicated that the program displayed during the webcast was the basic model and would not need any additional customization or code input.  (Id. ). After the initial two week implementation period, Manhattan informed Pan Western that the program could not produce any of the required documentation, and that the basic program would need to be customized.

As to the second prong of the fraud test, Pan Western presents evidence that raises a genuine issue of material fact as to Manhattan's knowledge or belief that its representations were false.  According to Pan Western,  it specifically stated to Manhattan that it had a limited budget for the purchase and installation of the software system.  (Id. at 6).  Pan Western also allegedly specified the features it would need.  According to Pan Western, Manhattan represented it could meet these program requirements with the basic model software.  (Id.). Manhattan therefore allegedly knew of Pan Western's specific requirements and represented that it could meet them with the basic software.  Viewing these facts in the light most favorable to Pan Western, the Court finds that a reasonable jury could infer that Manhattan knew it could not meet Pan Western's specifications without further customization and added fees.

As to the third prong of the fraud test, a genuine issue of material fact also exists regarding Manhattan's intention to induce Pan Western to consent to the contract's formation. Viewing the facts in the light most favorable to Pan Western, it appears Pan Western understood from Manhattan that it was purchasing a basic warehousing program that would not require additional costs to implement and use.  If, as Pan Western contends, Manhattan

was notified of Pan Western's needs, a reasonable finder of fact could conclude that Manhattan knew the limitations of its own program and also knew that the basic program would not fulfill Pan Western's needs without additional cost.  That Manhattan allegedly withheld this knowledge until after the contract was signed and the implementation process began gives rise to an inference that it intended to induce Pan Western to consent to the contract's formation.

As to the fourth prong of the fraud test, the evidence viewed in the light most favorable to Pan Western suggests that Pan Western justifiably relied upon Manhattan's misrepresentations.  Pan Western's evidence indicates that Manhattan orally represented to Pan Western that its basic software could meet its requirements.  Pan Western's evidence further indicates that Manhattan represented during the webcast demonstration that the required features would be included without additional cost.  There is no reason to suggest Pan Western was unjustified in its reliance upon Manhattan's alleged representations.

Finally, Pan Western indicates that it has incurred damages in attorney's fees and costs of litigating this matter to satisfy the damage prong of the fraud test.  Additionally, Pan Western must now expend additional funds to find another warehouse program to meet its needs.

In summary, the Court finds that genuine issues of material fact exist as to Manhattan's knowledge or belief that its representations were false and whether Manhattan intended to induce Pan Western to consent to the contract's formation.

### III. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment  (#18) is DENIED.

Dated this 23rd day of August, 2006.

_____
United States District Judge